DYK, Circuit Judge,
concurring in part and dissenting in part.
The majority today invalidates claims of two significant patents in my view utilizing a plainly incorrect claim construction. It upholds a jury verdict of anticipation that, under a proper claim construction, has no record support in expert testimony, much less the clear and convincing evidence necessary to invalidate the patent claims at issue.[1] The majority also finds lack of enablement in the absence of expert testimony that the experimentation required was excessive or not routine. I respectfully dissent.[2]
I
First, I disagree with the majority’s conclusion that the Hult reference anticipates claim 8 of the ’605 patent and claims 1 and 7 of the ’878 patent.
There is no question but that North-point’s invention constitutes a significant contribution to the communications art. The Federal Communications Commission (“FCC”) found that “Northpoint has presented a creative mechanism by which to receive greater use of a limited amount of spectrum, thus fostering spectrum efficiency.” (J.A. at 3405.) In a joint statement, former FCC Chairman Michael Powell and Commissioner Kathleen Q. Abernathy specifically noted that
Northpoint arrived at the Commission many years ago with a proposal for a new and innovative way to share the DBS spectrum. Today, thanks in large part to its fíne work and diligence, that service will go forward.... There is little question that had it not been for Northpoint, the MVDDS service would not be ready to move forward today.
(J.A. at 1012.)
This invention is recited in the patent claims at issue.[3] They describe an appara *1314 tus and method for reuse of the direct broadcast satellite (“DBS”) spectrum between satellite and terrestrial services. In the preferred embodiment, spectrum reuse is accomplished by the use of two directional antennas. One antenna is pointed south to receive DBS signals, while a second antenna is pointed north to receive terrestrially broadcast signals. Interference between the signals is avoided because the antennas are constructed to receive a useable signal only within a narrow range, and pointed such that undesired signals arrive at each antenna outside of that range.
The claimed anticipating reference (Hult) disclosed a method of sharing the UHF spectrum between space and terrestrial services by using adaptive array antennas for receiving satellite signals that “cancel[ ] out” the unwanted signal. (J.A. at 1931.) The question with respect to the Hult reference is whether it disclosed the “directional reception range” limitation. The district court construed “directional reception range” in the ’605 and ’878 patents as follows (and so instructed the jury):
A three-dimensional space about the centerline of a receiving antenna within which a usable signal can be received, a useable signal being a signal from which the information carried by it can be extracted.
*1315 Northpoint Tech. v. MDS Am., Inc., No. 01-CIV-14207, slip op. at 5 (S.D.Fla. Oct. 17, 2003) (emphasis added). Neither party-objected to the claim construction or to the jury instruction. Neither party challenges the claim construction of “directional reception range” on appeal, and the majority adopts the district court’s construction. Ante at 1306. That claim construction, referring to a “three-dimensional space about the centerline of a receiving antenna within which a usable signal can be received,” in my view clearly requires that the patented device achieve non-interference as a result of the geographic orientation of the two antennas so that each is outside the range of the unwanted signal due to the limitation of the antennas. The majority effectively' rejects the district court’s claim construction and construes the claims so that geographic separation is unnecessary, and the claims are satisfied if the unwanted signal is not received through electronic canceling of the unwanted signal rather than physical pointing. Since such electronic canceling was achievable using the adaptive array antennas of Hult, the majority finds that the asserted claims of the patents are anticipated.
In my view the majority’s claim construction is untenable even if we were to disregard the district court’s construction. The majority states that “nothing in the asserted claims requires that the antennas be physically pointed at the sources of the satellite and terrestrial signals.” Ante at 1307. I disagree because the claims require that the functionality of the receivers be geographically limited so that interference is avoided by the geographic orientation of the receivers. This is evident from the language of the claims themselves. For instance, claim 8 of the ’605¡ patent requires^the directional reception range of the first antenna to be “measured from a centerline” and that that antenna -be “positioned to receive” the signal. It also requires the second antenna to; be “aligned” so that the unwanted' Signal is not received.
The necessity for geographic separation is also made clear by numerous references in the specifications. Both patents state that “[t]he receiving antenna for DBS signals must, therefore, be limited to receiving signals in a directional range measuring plus or minus nine (9) degrees from a centerline of the antenna” and that “[i]n the single antenna arrangement, the an-ténna is movable between a position to receive DBS signals and another position to receive terrestrial signals.” ’605 patent, col. 1, II. 41-44, 56-59; ’878 patent, col. 1, II. 47-50, 62-65.[4] The specifications also state:
The object of the invention is accomplished by utilizing receiving antennas with a limited directional reception range and transmitting the terrestrial signals in a different range of directions than those in which the satellite signals are transmitted.... Both receiving antennas are adapted to receive signals only within a particular directional range. The range is measured from a centerline of the particular antenna.
’605 patent, col. 2, II. 19-28; ’878 patent, col. 2, II. 20-29.
*1316 There can be no serious contention that the adaptive array antennas of Hult do not limit the “directional reception range” using physical pointing. Hult teaches the use of adaptive array antennas “in a spectrum sharing or interference environment.” (J.A. at 4376.) An antenna array is an “assembly of antenna elements with dimensions, spacing, and illumination sequence such that the fields for the individual elements combine to produce a maximum intensity in a particular direction and minimum field intensities in other directions.” Info. Tech. Section, Gen. Servs. Admin., Telecommunications: Glossary of Telecommunications Terms A-16 (1997). A phased array (or adaptive array) accomplishes “beam steering without the mechanical and inertial problems of rotating” the entire antenna. John D. Kraus & Ronald J. Marhefka, Antennas for All Applications 572 (3d ed.2002). “[A]n adaptive array can automatically steer its beam toward a desired signal while steering a null toward an undesired or interfering signal.” Id. Thus, an adaptive array antenna automatically excludes (or cancels) signals coming from a particular direction without a change in its geographic orientation. The disclosure of an adaptive array does not anticipate.
Finally, the majority points out that Hult discloses not only the use of adaptive array antennas but the use of conventional directional antennas pointed at the transmitting source and the making of “small changes in antenna pointing” to reduce interference. Ante at 1308. The majority is correct that expert testimony here supports the view that Hult made such a disclosure. What is lacking is any expert testimony that the disclosures of Hult concerning the use of conventional directional antennas anticipate the three claims at issue here. The only testimony that directly addresses the issue of anticipation by Hult (and concludes that Hult anticipates) is Rubin’s cryptic and conclusory testimony concerning the Hult disclosure of adaptive arrays. Under these circumstances I conclude that the jury verdict of anticipation based on Hult cannot stand.[5]
II
I suggest that the majority also errs in sustaining the jury’s finding of lack of enablement because, again, the expert testimony is legally insufficient. The majority relies on four pieces of evidence to establish the quantity of experimentation required to practice the Northpoint patents: (1) Mr. Rubin’s testimony regarding the importance of maintaining the correct power level of the terrestrial transmission; (2) Dr. Badipour’s testimony regarding the experimentation performed leading up to and during MDS’ infringing test in Florida; (3) Northpoint’s report to the FCC detailing various interference mitigation techniques and Ms. Tawil’s testimony regarding the report; and (4) the Mitre report. Ante at 1308-1310. Based upon this evidence, the majority concludes that the jury correctly found the quantity of experimentation undue, apparently primarily with respect to the required power level.[6]
The testimony on which the majority relies to sustain the verdict does no more *1317 than establish that experimentation was required to determine the required power level. Rubin’s testimony plainly supports the assertion that power is very important, but it says nothing about whether or not undue experimentation was required to determine power.[7]
Neither does the remainder of the evidence relied on by the majority address the question of undue experimentation. Dr. Badipour said nothing about what experimentation one of ordinary skill in the art might consider excessive or not routine, nor did Northpoint’s FCC report. Ms. Tawil’s testimony regarding the FCC report does not support a conclusion that the techniques described therein would constitute undue experimentation to one of skill in the art. The Mitre report is also silent on undue experimentation. The only testimony as to whether an expert would consider the experimentation required to be excessive or not routine was presented by Northpoint, and it supported the view that the amount of experimentation was not undue. Northpoint’s expert, Dr. Miller, testified that the amount of experimentation was routine and not excessive.[8] Ms. Tawil, one of the inventors, also testified regarding the various interference mitigation techniques documented in the Mitre report and stated that “[a]ll of those techniques a person would know who’s skilled in the art would be necessary in order to stay out of the directional reception range and not cause interference with the satellite receiver.” (J.A. at 1603.) Thus, MDS presented no evidence showing that the experimentation conducted on the Northpoint system was anything but routine, or would be considered undue by one of skill in the art.
Undue experimentation is a matter of law based on underlying fact. Johns Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1354 (Fed.Cir.1998). Merely listing a quantity of experimentation is not sufficient to prove undue experimentation because “[t]he determination of what level of experimentation is ‘undue,’ so as to render a disclosure non-enabling, is made from the viewpoint of persons experienced in *1318 the field of the invention.” Elan Pharm., Inc. v. Mayo Found. for Med. Educ. & Research, 346 F.3d 1051, 1055 (Fed.Cir.2003). Similarly, we have held that
routine experimentation does not constitute undue experimentation: The test [for undue experimentation] is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed to enable the determination of how to practice a desired embodiment of the claimed invention.
Johns Hopkins, 152 F.3d at 1360 (quotations omitted) (brackets in original and emphasis added). Therefore, the evidence presented by MDS was legally insufficient to establish lack of enablement.
The majority asserts that there is no principle that requires that a witness testify as to whether experimentation was “undue.” Ante at 1310. I agree that expert testimony need not use the word “undue” but it must do more than talk about the absolute quantity of experimentation. It must suggest that the amount of experimentation would be considered excessive or not routine by one of ordinary skill in the art. Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1371 (Fed.Cir.1999) (reasonable amount of routine experimentation); Bruning v. Hirose, 161 F.3d 681, 686 (Fed.Cir.1998) (excessive); In re Wands, 858 F.2d 731, 740 (Fed.Cir.1988) (excessive); United States v. Telectronics, Inc., 857 F.2d 778, 785 (Fed.Cir.1988) (excessive).
In my view the majority errs in sustaining the jury’s findings of anticipation and lack of enablement. I would hold North-point’s patents not invalid and infringed.[9]

. Claim 8 of U.S. Patent No. 5,761,605 (the " '605 patent”) and claims 1 and 7 of U.S. Patent No. 6,169,878 (the " '878 patent”).

. I join part 11(D) of the majority opinion, which holds that the district court properly limited its holding of invalidity to the three asserted claims.

. Claim 8 of the '605 patent reads:
8. A method for simultaneously providing local originating signals on a common frequency with direct broadcast satellite signals transmitted from a satellite, where the satellite is in a first satellite location in geosynchronous orbit about the earth, the method comprising the steps of:
(a) at a user location, receiving direct broadcast satellite signals at a first fre *1314 quency with a first antenna adapted to receive signals at the first frequency only within a first directional reception range as measured from a centerline of the first antenna;
(b) transmitting terrestrial signals at the first frequency and in a terrestrial azimuth range from a terrestrial transmitter, the terrestrial azimuth range being outside of the directional reception range of the first antenna positioned to receive direct broadcast satellite signals from the satellite; and
(c) at the user location, remote from the terrestrial transmitter, receiving the terrestrial signals with a second antenna adapted for receiving signals at the first frequency only within a second directional reception range as measured from a centerline of the second antenna, the second antenna being aligned so that the direct broadcast satellite signals transmitted by the satellite are not transmitted within the directional reception range of the second antenna.
'605 patent, cols. 6-8 (emphases added). Claims 1 and 7 of the '878 patent state:
1. An apparatus for simultaneously transmitting terrestrial signals on a common frequency with satellite signals transmitted from a satellite, the satellite transmitting satellite signals at a first frequency to a user location for reception only within a satellite directional reception range about the user location, the apparatus comprising:
(a) a directional terrestrial transmitter for transmitting terrestrial signals at the first frequency in a limited azimuth range around the location of the terrestrial transmitter, the terrestrial transmitter being located with respect to the user location such that the terrestrial transmitter transmits to the user location along a route which is outside the satellite directional reception range.
7. A method for simultaneously providing terrestrial signals on a common frequency with satellite signals transmitted from a satellite, where the satellite is transmitting at a first frequency along a satellite transmission axis extending from the satellite to a terrestrial user location, the method comprising the step of:
(a) transmitting terrestrial signals at the first frequency in a limited azimuth range from a terrestrial transmitter, the terrestrial transmitter being located with respect to the user location so as to transmit to the user location along a transmission route which is outside of a satellite directional reception range about the user location, wherein the satellite directional reception range comprises a limited directional range substantially centered on the satellite transmission axis.
'878 patent, cols. 6-7 (emphases added).

. The patents make clear that the invention is not limited to a direction range of nine degrees. The specifications state:
Although current regulations require a spacing of no less than nine (9) degrees separation, the invention is not limited to this degree of separation. However, according to the invention, the effective reception range of each first antenna or satellite reception antenna must be less than or equal to the minimum satellite separation angle.
’605 patent, col. 3, II. 61-67; '878 patent, col. 3, I. 64-col. 4, I.-3..

. The accused infringers here relied on four other prior art references to show anticipation. The majority focuses on the Hult reference only and does not suggest that the other references anticipate. The other references are even weaker than the Hult reference, and in my view none of the references can support a jury verdict of anticipation.

. The majority lists a variety of other parameters required to practice the patents. Ante at 1309. There is simply no testimony at all that undue experimentation was necessary with respect to these, and I understand the majority to rely primarily on the power level.

. Mr. Rubin testified:
Northpoint's proposal has no mention of power. That's the one ingredient that determines whether people can coexist or not coexist. Northpoint’s patents is simply directional antennas. There's no power in it whatsoever. It's the power that everybody's being — transmitting that makes it work or not work. There's — in the North-point patents there is not one word, not one number about power.
(J.A. at 1976-77.) He further testified:
I would say power makes a big difference. That's what counts here, not anything else. The amount of power can destroy a broadcast receiver or it can allow it to operate. And there is nothing, nothing in the patent that says anything about power, nothing at all. The most critical factor is omitted.
(J.A. at 1990 (emphasis added).)

. Northpoint’s expert, Dr. Edward F. Miller, testified:
Q Was there enough information in the specification of the patents to enable that person of ordinary skill in the art to make and use a system of the type that’s described in the claims?
A Yes, I think after reading the claims, reading the patents, one of ordinary skill in the art would have been able to construct what's described in the patent
Q Well, that process you've just described of setting the transmitter up to some reasonable maximum power and dialing it back down to find the power level that you wanted to use, is that something that takes a lot of specialized knowledge and experimentation to accomplish?
A No, not really. Basically, one could do it with one person at the transmitter to control the power, another at the receiver and a cellular phone link between them so that their communication could be established to say, yes, the signal is being received, and the person adjusting the power could turn the knob or whatever other mechanism there is for changing the power level.
(J.A. at 2017-19.)

. The jury also found Northpoint’s patents obvious and indefinite. The majority did not reach these other issues. I would reverse the district court's conclusions as to obviousness and indefiniteness.