NEWMAN, Circuit Judge,
dissenting.
I respectfully dissent. After a three week trial the jury sustained the validity of these patents, the district court in a thorough opinion upheld the verdicts of validity, and validity was confirmed in three reexaminations by the Patent and Trademark Office. Today my colleagues on this panel hold that the inventions in the '681 patent and its continuation-in-part the '558 patent are obvious to them, and not infringed.
The undisputed evidence at trial was that these long-sought life-saving inventions were achieved amid general scientific skepticism, despite the extensive research that was being conducted by many scientists in this field, as set forth in the patents in suit. The discoveries of these inventors were met with universal acclaim and widespread utilization, including the founding of many commercial enterprises, all of which are reported to have licensed the patents except for these defendants. Unimpressed by these considerations, my colleagues on this panel now reconstruct these inventions by selection and inference, with perfect hindsight of the discoveries. The evidence at trial was that this achievement eluded persons working in the field, despite speculation concerning its potential and recognition of its value if it could actually be achieved; despite the powerful interest in such a life-saving advance. Instead, my colleagues simply reweigh selectively extracted evidence, ignore the actual peer response and acclaim at the time these inventions were made, and decide that this long-sought advance would have been obvious to this court.
Inventors Edward A. Boyse, Hal E. Broxmeyer, and Gordon W. Douglas made possible a new industry with PharmaS-tem’s predecessor Biocyte, Inc., founded by the inventors. The record contains many publications reporting the work of these inventors, and the evidence was undisputed that they were the first to achieve the transplantation of umbilical cord stem cells for reconstitution of the human hema-topoietic system. Although my colleagues manage to reconstruct this extensive scientific effort as simple routine that is obvious to judges, the processes of discovery in *1368 complex science make it particularly necessary to view the achievement in the context of the knowledge at the time the invention was made, and to judge it as it was judged by scientific peers at that time, with the assistance of the hard fact of commercial success in a field in which the need was great and success had long been eluded. See Graham v. John Deere Co., 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (“Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.”) (quoted in KSR International Co. v. Teleflex Inc., - U.S. -, 127 S.Ct. 1727, 1734, 167 L.Ed.2d 705 (2007)).
The panel majority scours the prior art for clues that could fit the eventual achievement, and then rules that the achievement was obvious, no matter that it eluded the others whose work is now compiled by this court so as to invalidate these patents. The “prior art” selected by my colleagues spans many years of scientific interest and effort, yet the ultimate discovery of the presence of stem cells along with or instead of progenitor cells, the successful preservation of these cells, the extensive experimentation with transplantation into animal models and ultimately into humans, and the successful hemato-poietic reconstitution of blood that has been destroyed by disease or radiation, was not achieved in the prior art. The judicial determination of “obviousness” should be made in the context of the state of knowledge at the time these inventions were made. Nor should the courts lose sight of the powerful policy that underlies the patent law, whereby recognition and protection of technological and scientific advance is legally established in order to serve the public interest in having the benefit of such advance through economic enterprise.
My colleagues ignore not only the scientific experts who testified at the trial, but also the PTO examiners who conducted the three reexaminations. In Dickinson v. Zurko, 527 U.S. 150, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) this court was reminded of its obligation to give appropriate deference to agency expertise, including that of the PTO. The references that are analyzed by the panel majority, in its sua sponte finding of obviousness, were before the PTO for examination and multiple reexaminations. My colleagues do not explain where the PTO went wrong; instead, they rearrange the past, criticize the acclaim heaped on these inventors, and propose that if the people in this field knew what this court knows, they would not have been so impressed.
To the contrary: the acclaim sounded by even these defendants is a powerful testament to how this invention was viewed. From my colleagues’ invalidation of these patents on the ground of obviousness, reversing the jury verdict, I respectfully dissent. I must also dissent from the rejection of the jury verdict of infringement, for the district court applied a new and incorrect evidentiary standard that does not warrant ratification.
THE VALIDITY ISSUES
The jury’s special verdicts upholding patent validity were sustained by the district court on post-trial motions. The defendants raised the ever-present multiple grounds of attack that appear in patent cases, and cross-appeal the jury verdicts on the issues of anticipation, indefiniteness, and obviousness, but do not appeal the verdicts for the plaintiff on the issues of inventorship, inequitable conduct, and antitrust violation. My colleagues reverse the jury verdict of unobviousness, and decline to reach the verdicts upholding validity on the issues of anticipation and indefinite *1369 ness. The district court sustained each of these verdicts. These issues were also raised for multiple reexaminations, and the PTO upheld patent validity on these grounds.
The teaching of Cardinal Chemical Co. v. Morton International, Inc., 508 U.S. 83, 97, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993) (“[T]he Federal Circuit is not a court of last resort. If that court had jurisdiction while the case was pending before it, the ease remains alive (barring other changes) when it comes to us. The Federal Circuit’s determination that the patents were not infringed is subject to review in this Court, and if we reverse that determination, we are not prevented from considering the question of validity merely because a lower court thought it superfluous.”), strongly encourages our appellate review of the major issues that were decided and appealed, if such issues would be relevant to patent validity upon further proceedings in the Court. Review of the issues of validity that were litigated sheds further light on the nature of the invention; leaving these issues in silent limbo, despite the elaborate trial and appellate briefing and argument of these issues, distorts the context of the jury verdicts as well as the reexaminations. In this context I discuss the several issues of validity that are appealed, and explain why their judgment also warrants affirmance.

Anticipation

The jury found that the patents had not been proven invalid on the ground of anticipation. “Anticipation” means lack of novelty; that is, that the invention was already known. It is a factual question whose finding, when tried to a jury, is reviewed for support by substantial evidence on the record as a whole. Acromed Corp. v. Sofamor Danek Group, Inc., 253 F.3d 1371, 1378-79 (Fed.Cir.2001); Advanced Display Sys. v. Kent State Univ., 212 F.3d 1272, 1281 (Fed.Cir.2000).
A patent claim is deemed anticipated when every element and limitation of the claim is found in a single prior art reference, either explicitly or inherently. Dayco Products, Inc. v. Total Containment, Inc., 329 F.3d 1358, 1368 (Fed.Cir.2003). In order to anticipate, the reference must place a person who has ordinary skill in the field of the invention, in possession of the invention. See Akzo N.V. v. United States Int’l Trade Comm’n, 808 F.2d 1471, 1479 (Fed.Cir.1986) (“anticipation requires that each and every element of the claimed invention be disclosed in a prior art reference. In addition, the prior art reference must be enabling, thus placing the allegedly disclosed matter in the possession of the public.”)
The reference on which the defendants rely for anticipation is an article by Keni-chi Koike entitled “Cryopreservation of Pluripotent and Committed Hemopoietic Progenitor Cells from Human Bone Marrow and Cord Blood,” 25 Acta Paediatrica Japónica 275 (1983). Koike describes the preservation, by freezing in liquid nitrogen, of pluripotent and progenitor cells of bone marrow and umbilical cord blood, and shows that these cells retain much of their progenitor activity upon thawing. Koike does not mention stem cells, and states that “hematopoietic progenitor cells, especially pluripotent progenitor cells are the most important to repopulate the bone marrow.” Id. at 276. Koike concludes with the suggestion that fetal cells or organs may be a source of progenitor cells for marrow transplantation, in the following statement:
[T]he results that cord blood cells contain many pluripotent and nearby progenitor cells comparable to marrow cells, indicate that fetal hematopoietic cells or organs may be useful as one of *1370 the sources of hematopoietic progenitor cells for marrow transplantation.
Koike at 281.
The defendants argued at trial, and repeat on this appeal, that even if stem cells were not known or shown by Koike to be present in umbilical cord blood, the claims are “inherently” anticipated by Koike because stem cells were present even if unknown. PharmaStem responded that inherent anticipation is avoided by lack of recognition, by lack of enablement, and by the limitations in the claims, including for the '681 claims the limitations to therapeutic compositions and the requirements that the cryopreserved cord blood units contain sufficient stem cells to reconstitute an adult. These aspects were extensively probed at the trial, and witnesses explained the various claim limitations and the prior art.
The district court, on post-trial motions, held that the jury verdict that the claims are not anticipated was supported by substantial evidence. The court referred to testimony of the expert witnesses for both sides, who agreed that Koike did not show hematopoietic reconstitution using cord blood, and that Koike did not enable transplantation. The defendant’s expert witness testified (on cross-examination) that Koike’s small samples could not contain a therapeutic amount of stem cells, and that the Koike article does not reflect knowledge of stem cells or indicate their presence to persons of skill in the field or show how to achieve transplantation of cord blood cells. As explained in In re Donohue, 766 F.2d 531, 533 (Fed.Cir.1985), possession of the invention adequate to show anticipation requires that a person of ordinary skill in the field of the invention would discern every element of the invention in the allegedly anticipating reference, and know how to carry it out based on the state of knowledge at the time of the reference. See, e.g., Elan Pharms., Inc. v. Mayo Found., 346 F.3d 1051, 1054 (Fed. Cir.2003) (a claim “cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled”). There was substantial evidence that Koike did not establish that there were stem cells in umbilical cord blood nor teach a therapeutic composition for use in hematopoietic reconstitution of a human adult.
The '681 patent describes the prior art in detail, including the following with respect to stem cells in human umbilical cord blood:
A human hematopoietic colony-forming cell with the ability to generate progenitors for secondary colonies has been identified in human umbilical cord blood (Nakahata, T. and Ogawa, M., 1982, J. Clin. Invest. 70:1324-1328). In addition, hematopoietic stem cells have been demonstrated in human umbilical cord blood, by colony formation, to occur at a much higher level than that found in the adult (Prindull, G., et al., 1978, Acta Paediatr. Scand. 67:413-416; Knudtzon, S., 1974, Blood 43(3):357—361).
'681 patent, col. 4, lines 15-24. The '681 patent explains that the differences between stem and progenitor cells are operational and depend on functional rather than on morphological criteria. Col. 3, lines 4-39. In functional assays, stem cells can be identified by spleen colony forming units (CFU-S), whereas multipotent progenitor cells can be identified through colony-forming unit-granulocyte, erythrocyte, monocyte/macrophage, megakaryocyte (CFU-GEMM) relatively differentiated progenitor cells through colony-forming unit-granulocyte, macrophage (CFU-GM) and burst-forming unit-erythroid (BFU-E). Id. at col. 26, lines 1-16. Koike, in determining the viability of the cryopre-served fetal bone marrow and cord blood, *1371 employed CFU-GM and BFU-E assays to measure progenitor cells, not stem cells.
The patent examiner concluded, and witnesses at trial testified, that the Koike reference is directed to progenitor cells, not stem cells. The reexamination record was in evidence, wherein the examiner stated:
The remaining references that recited umbilical cord blood, specifically the Koike and Vidal references, recited the cryopreservation of a Ficoll-Hypaque fraction of umbilical cord blood and did not provide any evidence that viable human neonatal or fetal hematopoietic stem cells were present in the thawed samples.
Notice of Intent to Issue Reexamination Certificate at 4 (Jan. 11, 2000). The examiner observed that Koike did not mention stem cells and did not show or enable transplantation to an adult, and that although Koike postulated that cord blood may be a source of hematopoietic progenitor cells, Koike did not show how or if such use could be achieved. The examiner’s reasons for allowance included the following:
... Since hematopoietic stem cells engage in both replication and differentiation, the presence of progenitors (differentiated stem cells) is not predictive of the presence of stem cells. All of the prior art references which taught the cryopreservation of a Ficoli-Hypaque fraction of umbilical cord blood assayed for the presence of progenitor cells and merely theorized on the presence of stem cells. None of the prior art references demonstrated the presence of stem cells in the umbilical cord blood.
Id. When the reference relied on at trial was before the patent examiner, a reasonable jury may give weight to the examiner’s view of the reference when deciding whether invalidity has been proved by clear and convincing evidence. See Hewlett-Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464, 1467 (Fed.Cir.1990) (referring to the particularly heavy burden in establishing invalidity on the same prior art that was examined in the PTO).
The defendants argue that it is irrelevant whether Koike described or recognized the presence of stem cells in cord blood, because they were inherently there. However, as discussed in Turbo-Care Div. of Demag Delaval Turboma-chinery Corp. v. General Electric Co., 264 F.3d 1111, 1119 (Fed.Cir.2001), “[i]n order for a disclosure to be inherent, ‘the missing descriptive matter must necessarily be present in the [original] applicant’s specification such that one skilled in the art could recognize such a disclosure,” (quoting Tronzo v. Biomet, Inc., 156 F.3d 1154, 1159 (Fed.Cir.1998)). As the district court pointed out and as the expert witnesses testified, Koike does not show the claim limitations to therapeutic compositions or that the cryopreserved blood units must be from a single human or that stem cells must be present in an amount sufficient for hematopoietic reconstitution of a human adult, or suggest how to conduct a successful transplantation. Witnesses testified that persons in this field of science did not have the knowledge to routinely fill these omissions, and reinforce the examiner’s statement that “the presence of progenitors (differentiated stem cells) is not predictive of the presence of stem cells.” See Reexamination Notice of Intent, supra; see also Elan Pharmaceuticals, 346 F.3d at 1057 (discussing the need for evidence on the question of whether the reference placed a person of ordinary skill in possession of the invention as claimed); Rosco, Inc. v. Mirror Lite Co., 304 F.3d 1373, 1380 (Fed.Cir.2002) (“Under the doctrine of inherency, if an element is not expressly disclosed in a prior art reference, the reference will still be deemed to antici *1372 pate a subsequent claim if the missing element ‘is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill.’ ”) Particularly when the science or technology is new or complex, a bare suggestion or hope that requires significant experimentation for implementation or verification is not an invalidating “anticipation” of that which is ultimately achieved.
These aspects were explored at the trial, with witnesses for both sides agreeing that it was not known, at the time of the Koike reference, how to use cord blood for marrow transplantation and human reconstitution. The district court concluded that a reasonable jury could have found that no single reference described all of the '681 patent claim limitations, explicitly or inherently. The panel should review this issue in the interest of finality, and rule that the verdict that anticipation of the '681 claimed invention had not been established was supported by substantial evidence, and was properly sustained by the district court.
The '553 claims are directed to method steps, including the step of introducing the stem cells into a human host. The district court summarized the evidence as follows:
It is undisputed that Koike did not introduce cord blood into a human, which is a necessary limitation of the '553 Patent. The defendants claim that Koike’s suggestion that introducing the stem cells into a human host should be done is a sufficiently enabling disclosure to warrant a finding of anticipation. Even so, the record contains substantial evidence from which a jury could find that a person of ordinary skill in the art would not have been so enabled.
Pharmastem Therapeutics, Inc. v. Viacell, Inc., 2004 WL 2898061 at *4 (D.Del.2004).
The defendants argue that Koike is as enabling as the patents in suit — an argument that could well have been rejected by the jury, for the '681 patent describes extensive animal transplantation experiments and shows surrogate assays of over one hundred cord blood units, and the '553 patent includes details of the transplantation of cryopreserved fetal cord stem cells to reconstitute the blood of a five-year-old child who was suffering from Fanconi’s Anemia; in contrast with the absence of any such information in the Koike reference. The district court held that there was substantial evidence whereby a reasonable jury could have found that the Koike reference did not anticipate the '553 claims. I agree. The panel should review and resolve this issue, which was fully appealed, in the interest of finality.

Indeñni teness

A similar obligation applies to the cross-appeal of validity on the ground of indefiniteness. The matter was fully presented on the appeal to this court, and warrants resolution.
The defendants challenged both patents under 35 U.S.C. § 112, arguing that the claims are indefinite because, at the time the patent applications were filed, stem cells in umbilical cord and placental blood could not be identified and the stem cell content could not be measured. The defendants’ position is that measurement of stem cell content required actually transplanting the blood into a host and observing its effect, and that since the '681 composition claims require stem cells “in an amount sufficient to effect hematopoietic reconstitution of a human adult,” the defendants could not know if they were infringing the claims. PharmaStem’s position is that surrogate animal tests, as shown in its patents, adequately measure stem cell content. PharmaStem points out that the defendants all test the cord blood before placing it in storage and when releasing it for transplant. The jury found *1373 that the claims were not invalid on this ground, answering Question No. 10:

Question No. 10

Have the Defendants proven by clear and convincing evidence that the '681 patent is indefinite in that on November 12,1987, a person of ordinary skill in the art would not have been able to determine from the patent what the claimed invention covers?
YES _ NO _X_
Witnesses explained at the trial that the '681 specification describes the conduct of surrogate assays and their use to test for stem cells, and correlates the surrogate assays with therapeutic stem cell effect. Reviewing the evidence, the district court referred to the expert testimony of Dr. Malcolm Moore, a cell biologist, that the patents provide “ample information to determine the amount of cord blood needed for transplant in adults and children, and that the scientific community has in fact performed numerous transplants into adults. Moore Tr. at 340-348.” Pharmastem, 2004 WL 2898061 at *5.
Section 112 requires that the claims point out “the subject matter which the applicant regards as his invention,” implementing the purpose of claims to identify what has been invented and found patentable, so that “one skilled in the art would understand the bounds of the claim when read in light of the specification.” Miles Laboratories, Inc. v. Shandon, Inc., 997 F.2d 870, 875 (Fed.Cir.1993) (“If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more.”)
The courts have recognized, particularly in fields of new and evolving knowledge, that the claims can be no more precise than the knowledge in the field permits. See Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1385 (Fed.Cir.1986) (“ ‘if the claims, read in light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more’ ”) (quoting Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624 (Fed.Cir.1985)). See also, e.g., Marley Mouldings, Ltd. v. Mikron Indus., 417 F.3d 1356, 1361 (Fed.Cir.2005) (when a claim “is not insolubly ambiguous, it is not invalid for indefiniteness”); Exxon Research & Eng’g Co. v. United States, 265 F.3d 1371, 1375 (Fed.Cir.2001) (“if the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds”). The defendants argue that even if this criterion is met, it is inadequate to satisfy § 112 in this case because the defendants had no way of being certain whether any unit of cord blood infringed the claims. The defendants argue that even if the science later evolved so that stem cell content could be directly measured, such information did not exist when the '681 application was filed.
To patent an invention when the science or technology to which it is directed is incompletely developed or understood, requires that it be described and claimed in terms adequate to communicate, to persons experienced in the field of the invention, what has been discovered. The '681 patent states that “any of numerous assays for hematopoietic stem or progenitor cells may be used.” Col. 25, lines 49-50. For example:
[A]n item cell assay for CFU-S (colony forming unit-spleen) can be done. In this assay, cells considered to be multi-potential stem cells with self-renewal capacity can be measured by counting the number of colonies (nodules) on the spleen(s) of lethally-irradiated mice that *1374 have been inoculated with a composition containing the cells.
Col. 26, lines 1-7. The CFU-S assay is done essentially the same way as progenitor cell assays such as BFU-E/CFU-GEMM and CFU-GM assays. Col. 48, lines 42-43. The specification states:
A survey of published reports indicates that the number of CFU-GM infused for autologous bone marrow reconstitution in human patients, can be relied on as an indicator of the potential for successful hematopoietic reconstitution (Spitzer, G., et al., 1980, Blood 55(2): 317-323; Douay et al., 1986, Exp. Hematol. 14:358-365). By standardizing published data by patient weight, and assuming a patient weight of 150 pounds (67.5 kilograms), the calculated number of CFU-GM needed for successful hemato-poietic reconstitution using autologous bone marrow cells ranges from 2-425 x 104, with faster recovery noted using greater than 10 x 104 CFU-GM.
Col. 50, line 64 to col. 51, line 8. The expert testimony at trial explained this and other descriptive text, whereby a reasonable jury could have concluded that the assays described in the patent serve to ascertain whether sufficient amounts of stem cells are present in the preserved cord blood to reconstitute the host.
It was not disputed that the information in the specification is as definite as the state of scientific knowledge at the time of filing. It has been recognized that the “existence of an inescapable area of uncertainty is not sufficient justification for denying to the patentee the fruits of his invention.” Ga.-Pac. Corp. v. U.S. Plywood Corp., 258 F.2d 124, 136 (2d Cir.1958) (“the policy of the patent statute contemplates granting protection to valid inventions, and this policy would be defeated if protection were to be accorded only to those patents which were capable of precise definition. The judicial function requires a balancing of these competing considerations in the individual case.”) The district court fulfilled this judicial function, stating, in denying the defendants’ motion for JMOL, that: “Given that there is no determinate or determinable minimum amount of cord blood for therapeutic usefulness in humans, the record supports that the '681 claim language is as precise as the subject matter permits.” Pharmastem, 2004 WL 2898061 at *5 (citing Hybritech, supra). As the district court ruled, there was substantial evidence whereby the jury could have found that the claims of the '681 and '553 patents would be understood by persons in the field of the invention. The verdict that the claims are not invalid for indefiniteness should be sustained, and should be reviewed, not left dangling on appeal.

Obviousness

The ultimate solution of a previously intractable problem can indeed appear to become apparent in hindsight after the final successful step is taken. Yet that final step in this case was not taken by those who came before, and was clearly not “obvious” to contemporaries, who acclaimed the achievement. Even the defendants’ expert witness acknowledged that before the work of these inventors “stem cells could not be conclusively proved to be present in cord blood.” Maj. op. at 1362. Nonetheless this court rejects the testimony and admissions of the defendants, and uses present knowledge of the inventors’ success to find that it was obvious all along.
When trial is to a jury, the court instructs the jury as to the applicable law, and the jury applies the law to the facts as it finds them. Appellate review is on the standard of determining whether there was substantial evidence to support the jury’s express or presumed factual findings, and whether the jury applied the *1375 correct law to those findings. See C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1351-52 (Fed.Cir.1998) (“We review a jury verdict of obviousness to determine whether substantial evidence supports the factual findings predicate to the legal conclusion of obviousness and whether such findings can support the verdict, with appropriate consideration of the presumption of validity and the requirement that obviousness be proved by clear and convincing evidence; factual inferences are drawn and credibility determinations are accepted in favor of the verdict winner”) The question is whether the jury’s verdict is sustainable on the evidence presented, not whether we could have or would have gone the other way on the evidence presented.
The jury answered “NO” to the question whether the '681 and '553 claimed inventions “would have been obvious to a person of ordinary skill in the field of the invention.” Responding to the defendants’ challenge to the verdict, PharmaStem points to the evidence of the extensive research in this field of science — much of which is set forth in the patent specifications — and to the specific claim limitations. The broadest composition claim (the '681 patent) is as follows:
1. A cryopreserved therapeutic composition comprising:
viable human neonatal or fetal hema-topoietic stem cells derived from the umbilical cord blood or placental blood of a single human collected at the birth of said human,
in which said cells are present in an amount sufficient to effect hematopoietic reconstitution of a human adult;
and an amount of cryopreservative sufficient for cryopreservation of said cells.
This claim was the subject of two reexaminations, one preceding this litigation, the second completed during the past year. For the first reexamination, the examiner’s reasons for allowance included the following:
The claims as amended now avoid the prior art for the following reasons. First, it was noted that the only piece of prior art which taught a composition which could have combined an amount of viable human neonatal or fetal hemato-poietic stem cells sufficient to effect he-matopoietic reconstitution of a human adult was the reference of Ende. The Ende reference, published in 1972, recited the treatment of an individual undergoing treatment for leukemia who received a series of cord blood infusions from multiple donors and showed a transient change in red blood cell phenotype. Even though the authors of the Ende article describe the procedure as “transplantation,” it is clear that such treatment did not result in hematopoietic reconstitution. Further, since no HLA typing was performed, and multiple infusions were performed, one of ordinary skill in the art would have taken the disclosure of Ende to be equivalent to blood transfusions and would have had no expectation that the hematopoietic reconstitution of a human adult could have been performed. As a transfusion composition, one of ordinary skill would have had no motivation to cryopreserve the cord blood, since whole blood for transfusion is not frozen, but stored st 4°C and Ende further points out that any hospital with a maternity ward would provide sufficient aliquots of fresh cord blood.
Notice of Intent to Issue Reexamination Certificate at 3-4 (Jan. 11, 2000). The examiner discussed the state of the science, the content of the prior art, the known sensitivity of fetal liver and thymus stem cells to freezing, and the unpredictability of this field, and concluded:
*1376 This disclosure combined with the acknowledged sensitivity of hematopoietic stem cells from fetal liver and thymus to cryopreservation and the fact that DMSO is toxic to fetal liver progenitor cells at concentrations nontoxic to bone maiTOw cells provides an unpredictability in the art of cryopreservation of stem cells from different sources that renders the suggestions of the prior art references as to the therapeutic uses of umbilical cord blood (whether eryopre-served or not) as a course of hemato-poietic stem cells a situation of “obvious to try,” which fails to provide a prima facie finding of obviousness....
Id. at 4.
For the second reexamination, the examiner discussed additional arguments involving the same references on which this court now relies to invalidate the patent:
At the time of the instant invention the use of cord blood for hematopoietic reconstitution had never been accomplished. Additionally, in vitro expansion of cord-blood stem cells prior to patient implantation had not been successfully employed, and indeed is not in use as of today as indicated by the Dr. Zander declaration. Accordingly, determination of a pharmaceutically efficacious and safe dosage that results in human adult hematopoietic reconstitution would necessarily require undue experimentation, thus precluding enablement. In this respect, it was patentee’s in vitro progenitor assays taken in conjunction with in vitro mice testing showing hematopoietic reconstitution with a relatively small amount of neonatal blood, that provided the necessary teaching to enable the obtaining of effective hematopoietic reconstituting dosages in children (extrapolatable to adults) by utilizing cord blood volumes (50-100 ml) derived from a single adult. Thus, neither the Koike reference taken alone anticipates, nor a combination of references render obvious, the instantly claimed invention.
Reexamination — Reasons for Patentability/Confirmation (Dec. 29, 2006). No error has been shown in this analysis, which warrants deference in accordance with the strictures of the Administrative Procedure Act. See Dickinson v. Zurko, 527 U.S. at 164, 119 S.Ct. 1816 (“A reviewing court reviews an agency’s reasoning to determine whether it is “arbitrary” or “capricious,” or, if bound up with a record-based factual conclusion, to determine whether it is supported by “substantial evidence.” ”), citing SEC v. Chenery Corp., 318 U.S. 80, 89-93, 63 S.Ct. 454, 87 L.Ed. 626 (1943).
The record contains testimony that scientists working in the field of hematopoietic reconstitution did not expect cord blood to be a successful transplant tissue or a useful source of hematopoietic stem cells. There was testimony that earlier efforts at using cord blood had encountered problems, and that there was skepticism and surprise at the inventors’ achievement. The reaction of scientific peers after the achievement is relevant to whether the invention would indeed have been obvious at the time it was made. See Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 381 F.3d 1371, 1376 (Fed.Cir.2004) (evidence of skepticism that the multi-mode treatment of the invention could be achieved supported the jury verdict of non-obviousness); Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings, 370 F.3d 1354, 1368 (Fed.Cir.2004) (evidence that skilled artisans were initially skeptical about the invention supported the jury’s verdict of nonobviousness).
The significance of the inventors’ work was in evidence, including their founding of Biocyte and spawning of the industry of collecting and cryofreezing umbilical cord blood. In evidence was defendant Via- *1377 Cord’s “business plan” which identified these inventors as “the trailblazers”:
The founding scientists are core researchers in this field and have published many related articles. Biocyte’s time, energies, and financial resources have been spent doing much education and development in this field. They are the trailblazers.
A communication to these inventors from the founder of defendant Cryo-Cell stated:
[N]o one will ever dispute that you, as the pioneers in the medical technology ... will be the frontrunners in the field of utilizing of the blood from the umbilical cord for restoring hematopoietic through marrow transplants.
Such evidence assists in replacing judicial hindsight with objective determination as of the time of the invention. See Vandenberg v. Dairy Equip. Co., 740 F.2d 1560, 1567 (Fed.Cir.1984) (in “determining the question of obviousness, inquiry should always be made into whatever objective evidence of nonobviousness there may be”). In Graham v. John Deere Co., 383 U.S. 1, 17-18, 36, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) the Court counseled that “Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., “serve to guard against slipping into use of hindsight and to resist the temptation to read into the prior art the teachings of the invention in issue,” ” cited in KSR v. Teleflex, 127 S.Ct. at 1734.
PharmaStem’s expert, Dr. Bernstein, testified that no prior art showed that cord blood contains stem cells, and that persons of skill in this field would not have had a reasonable expectation of success in carrying out the claimed process. Dr. Bernstein also discussed the early uncertainties and mistaken understanding concerning stem and progenitor cells. His testimony is now disputed by this court, denying it the weight that a reasonable jury could have given it. Dr. Bernstein had explained at the trial that at the time of filing the patent application the differences between stem cells and progenitor cells could not be measured and were not well understood. The jury could have accepted this testimony, and indeed the defendants did not refute it; but the panel majority now holds that the inventors’ apparently inconsistent use of stem and progenitor terminology constitutes an “admission! ] in the specification regarding the prior art” which is then “binding on the patentee for purposes of a later inquiry into obviousness.” Maj. op. at 1362. This is not a simple issue, but the jury could reasonably have concluded, as did the district court, that the prior art did not show that there were stem cells in cord blood, and that one of ordinary skill in this field would not have had a reasonable expectation of successful use of cord blood to reconstitute a human adult.
A reasonable jury could have found that these inventors were not simply conducting a routine optimization, as my colleagues now rule on what they describe as the “more difficult question [of] whether the prior art would have given rise to a reasonable expectation of success in creating the [claimed inventions].” My colleagues state that they are “plainly satisfied” that “a person of ordinary skill in the art would have had reason to attempt to make [the claimed inventions].” I agree that there was reason to seek a cure for destroyed blood cells, and that scientists have been seeking such a cure for a long time, including those scientists whose work is the cited prior art. There has been much hopeful speculation about the potential of stem cells, although this remedy eluded those who came before.
It is often far easier to recognize the problem than to find and demonstrate the solution. The patent law recognizes that advances of great power may be based as *1378 much on persistent and skilled investigation as on the flash of creative genius, for both serve to transcend that which was previously achieved. See 35 U.S.C. § 103 (“Patentability shall not be negatived by the manner in which the invention was made.”) My colleagues go too far in limiting the patent system to the serendipitous and the unexpected. Maj. op. at 1363 (“while their work may have significantly advanced the state of the science of hema-topoietic transplantations by eliminating any doubt as to the presence of stem cells in cord blood,” they “merely used routine research methods to prove what was already believed to be the case”). Further, these scientists not only established the presence of stem cells, but also enabled their development for preservation and he-matopoietic reconstitution.
The court’s approach reflects misperception of the scientific process as well as the patent purpose. Scientific methodology usually starts with a hypothesis based on what is already known; the record shows that several scientists mentioned the idea of rebuilding destroyed blood cells. However, none achieved this long-sought goal, and the record shows the extreme skepticism concerning even the possibility of this achievement. The district court found that there was “tremendous skepticism in the transplant field regarding the use of cord blood as a transplant tissue,” and that the jury could have found that “prior to the inventions of the Patents-in-suit, those in the field of hematopoietic reconstitution would not have expected cord blood to be a successful transplant tissue.”
Nonetheless, my colleagues deny the value of this long-sought result, whereby for the first time umbilical blood was preserved and recovered and used to reconstitute the hematopoietic systems in mammals, demonstrated with the mice experiments reported in the '681 patent, and the human transplant in the '553 patent. Not even the defendants denigrate the inventors’ achievement as “merely supporting evidence” for an “expected” result, as in the maj. op. at 1365. Even if this court were not required to recognize the substantial evidence in support of the jury verdict, even if APA deference were not required to the three PTO reexaminations, one must pause at the powerful evidence of the acclaim that was accorded to this achievement, by these defendants as well as by scientific peers.
There was substantial evidence whereby the jury could have sustained the unobvi-ousness of the '681 and '553 inventions. I must, respectfully, dissent from the panel majority’s invalidation of these patents on this ground.
INFRINGEMENT
The jury found infringement of the '681 and '553 patents. In determining whether substantial evidence supported the verdict, the evidence before the jury and all reasonable inferences therefrom must be viewed in the light that is favorable to the verdict, without substituting the court’s view of the evidence for that of the jury. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254-55, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp., 225 F.3d 1349, 1355 (Fed.Cir.2000) (“In reviewing the record, we must draw all reasonable inferences in favor of the prevailing party, and not make credibility determinations or substitute our view of the conflicting evidence for that of the jury.”) My colleagues, like the district court, grant JMOL on a ruling of law and evidence that was not presented to the jury, and that in all events does not support reversal of the verdict.
My colleagues appear to hold that infringement cannot be found because the cryopreserved cord blood “relates only as possibilities” for “future use in adult trans *1379 plants.” Indeed, this entire system is designed for possible future needs of the infant itself or family members. The defendants’ testimony was uniformly to the effect that this “possibility” was the purpose of their preservation service (the record also describes a case in which the cord blood was used to treat the mother’s existing disease). The evidence was that most but not all of the cryopreserved cord blood that has been transplanted was to children, with about ten percent transplanted to adults. PharmaStem is correct that this ratio relates to damages, and does not simply serve to negate all liability for infringement.
The district court ruled that PharmaS-tem had not proved infringement because PharmaStem did not separately analyze the stem cell content of each sample of cord blood. PharmaStem presented evidence that separate analysis was unnecessary because each defendant had analyzed each sample before accepting it for storage. Every defendant testified that the blood it collected and stored was analyzed for cell content at the time of collection. The jury was not instructed that such evidence was inadequate and inadmissible— as the district court ruled post-trial. On the evidence presented, this is not a sound basis for rejecting the jury’s verdict. The tardy rejection of the testimony of Phar-maStem’s expert witness, Dr. Hendrix, is an inappropriate application of Daubert and its succeeding cases, on which the panel majority relies, for there was no criticism of the expert’s scientific credentials or her analysis of the prior art and the state of the science. See Daubert v. Merrell Dow Pharms., 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (for a scientific assertion to “qualify as ‘scientific knowledge,’ an inference or assertion must be derived by the scientific method”); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (the principles of Daubert apply broadly to “scientific, technical, or other specialized knowledge”).
The district court’s ground of exclusion was not that Dr. Hendrix made an error of law or of scientific fact, but simply that she also stated her opinion concerning the defendants’ marketing statements that they test and preserve cord and neonatal blood for possible future child and adult use— testimony that the district court criticized because it did not require scientific expertise. Whatever the virtue of that criticism, it is clear that the district court’s (and my colleagues’) exclusion of the entire testimony of this eminent scientist on this ground is not what the Daubert ruling is about. There was no testimony contrary to the view of Dr. Hendrix of the scope of the representations made in the marketing materials, and no challenge to the accuracy of her statements. Presentation of expert testimony was in compliance with the general rule that “typically expert testimony will be necessary in cases involving complex technology,” Centricut, LLC v. Esab Group, Inc., 390 F.3d 1361, 1370 (Fed.Cir.2004), and this expert’s testimony did not cross the boundaries of admissibility.

The '681 Patent

The district court granted JMOL of non-infringement of the '681 patent on the ground that PharmaStem had not proved that 100% of the defendants’ preserved cord and neonatal blood contained sufficient stem cells to reconstitute an adult. The district court reasoned that since PharmaStem took the litigation position that it was entitled to damages measured as a royalty based on 100% of the preserved blood, to prove infringement Phar-maStem had to prove that 100% of the preserved blood contained sufficient stem cells to provide adult reconstitution, by analyzing 100% of the preserved blood. As I have mentioned, PharmaStem complains that this criterion differed from that *1380 on which the jury was instructed, and also states that even this criterion was met by substantial evidence presented at the trial.
My colleagues, overturning the jury verdict, hold that there is no infringement of the '681 patent because PharmaStem did not retest every unit of stored blood to determine its stem cell content. They ignore the evidence that every unit was tested by each defendant before being placed into cryogenic storage; every defendant so testified. It was not disputed that retesting of every unit could use up a significant amount of the precious preserved blood. No defendant asserted that it routinely cryogenically preserved cord blood that did not contain sufficient stem cells to be potentially useful for hematopoietic reconstitution. A reasonable jury could have considered this evidence to find that each element of the claims was met. Instead, my colleagues simply rule that without testing of the stored units there can be no liability at all. That evidentiary theory was not presented to the jury; it is too late to criticize as legally inadequate the testimony that was based on the defendants’ own representations concerning the content of the stored umbilical and neonatal blood.
The verdict of infringement was supported by the defendants’ own testimony setting forth their requirements for stem cell content before accepting cord blood for cryopreservation. For example, defendant CBR’s Scientific Director testified that every unit of cord blood presented to CBR for storage is tested to see if it contains a sufficient amount of stem cells to have “a good probability of being useful in the clinical setting.” In evidence were CBR’s website statements that “transplants have occurred for the newborn himself, the newborn’s mother, father, and the newborn’s cousin,” and “umbilical cord blood from unrelated donors can restore hematopoies-is in adults who receive myeloablative therapy and associated with acceptable rates of severe acute and chronic GVHD [Graft vs. Host Disease].”
The President of defendant CorCell testified that “what our marketing materials state [is] that it may be used to treat the donor or siblings or potentially parents,” and that although only one CorCell stored cord blood unit had thus far been transplanted, that transplant was to an adult. There was testimony that CorCell’s cord blood samples are tested for “total nucleated, CD-344- and viability cell counts before and after processing,” and “a colony-forming assay is conducted to evaluate the quality and quantity of umbilical stem cells,” and that a sample is usually not preserved if its stem cell content is determined to be unsuitable for possible future use. The jury was shown CorCell’s representation to investors that “a recent study of twenty-five (25) patients, published in the New England Journal of Medicine, similarly indicates that cryopreserved umbilical cord blood stem cells can be successfully engrafted in children and adults with a variety of hematologic or immunologic disorders.” The jury saw evidence that CorCell defines potential recipients of the stored stem cells as “the family members of the newborn, mother, father, siblings and possibly grandparents.”
Defendant ViaCell’s founder testified that each cord blood sample was tested to ensure that there is a sufficient amount of stem cell content to be therapeutically useful, as determined by ViaCell’s Scientific Advisory Board. ViaCell’s Senior Vice President testified that ViaCell counts the cells in every collected sample, and that its standard procedure states: “A minimum total NC count of 3.0 x 108 is required to proceed with processing.” A ViaCell memorandum to investors stated that about 10% of all cord blood transplants were in adults, and a ViaCell witness testi- *1381 fled that ViaCell informs the public about adult use.
At the trial none of the defendants denied the stem cell content of the blood they eryopreserved, other than to state that for the few cases where their analysis at collection showed weak stem cell content they would consult with the infant’s family before accepting and freezing the blood. The jury heard the defendants’ testimony and unqualified representations concerning their screening of every stored sample of cord blood for stem cell content, and that they did not distinguish between potential child and adult use of the stem cells. The jury could have relied on the defendants’ testimony that their minimum threshold for cryopreservation is sufficient stem cells for transplantation, and that all of the defendants included possible adult use in their publicly-stated reasons for storing fetal cord and neonatal blood. PharmaS-tem points out that it was neither necessary nor prudent to test each unit of the defendants’ stored blood for stem cell content, when each defendant had already done so.
The jury was instructed: “A defendant is liable for directly infringing PharmaS-tem’s patents if you find that PharmaStem has proven by a preponderance of the evidence that they have made, used, offered for sale or sold a composition that includes each and every element of at least one of the asserted claims of the '681 patent.” The theory that each stored sample had to be separately analyzed by Phar-maStem to show infringement was not presented as law to the jury. This was a new standard for infringement, for the jury was not told that the defendants’ analyses of stem cell content could not provide evidence of stem cell content.
When there is substantial evidence in support of the jury’s verdict, it is irrelevant whether the appellate court would have preferred different or additional evidence. “When the jury is supplied with sufficient valid factual information to support the verdict it reaches, that is the end of a matter .... the jury’s factual conclusion may not be set aside by a JMOL order.” McGinley v. Franklin Sports, Inc., 262 F.3d 1339, 1355 (Fed.Cir.2001). The district court erred in holding that it was necessary for PharmaStem to analyze, or provide detailed analysis results, for the individual blood units in order to find infringement. My colleagues commit the same error, reweighing the evidence to reach their preferred result, rather than considering whether substantial evidence as presented at the trial supports the verdict that was reached by the jury.

The '553 Patent

It was agreed at trial that the claims of the '553 patent are not infringed until the step of transplanting the stem cells takes place. Since relatively few transplants of stored blood had been done, the royalties awarded by the jury were modest, and were not appealed. However, the verdict of infringement is supported by substantial evidence, and should stand. There was substantial evidence that each step of the claimed invention is performed by the defendants followed by a transplant surgeon. Referring to claim 13, the defendants isolate the umbilical cord and placental blood containing stem cells and cryopreserve it in liquid nitrogen; claim clauses (a) and (b). When instructed on behalf of the donor or family members, the blood is delivered to a surgical environment where it is thawed, claim clause (c), and transplanted into the human host, claim clause (d):
13. A method for hematopoietic or immune reconstitution of a human comprising:
(a) isolating human neonatal or fetal blood components containing hemato-poietic stem cells;
*1382 (b) cryopreserving the blood components;
(c) thawing the blood components; and
(d) introducing the blood components into a suitable human host, such that the hematopoietic stem cells are viable and can proliferate within the host.
The jury found the defendants liable for “acting in concert or working together” with the transplant physicians, or contributing to the infringement of the '553 patent, upon answering the following questions:

Question No. S: Substantial Non-Infringing Use

Has PharmaStem proven by a preponderance of the evidence that cryopreserved cord blood has no substantial noninfringing use?
YES _X_ NO_

Question No. f: Direct Infringement

Has PharmaStem proven by a preponderance of the evidence that defendants and the transplant physicians are acting in concert or working together to complete the process of infringement of claims 13, 19, 47, 53, or 57 of the '553 patent by performing each and every one of the steps in any of those claims?
YES _X NO_

Question No. 5: Contributory Infringement

Has PharmaStem proven that a defendant has contributorily infringed the '553 patent by selling or offering to sell cryopreserved cord blood that was actually used by a third party in the direct infringement of any of claims 13, 19, 47, 53, or 57 of the '553 patent?

Answer separately for each defendant.

ViaCell YES X_ NO _
CBR YES _X_ NO_
Cryo-CellYES X_ NO_
CorCell YES X_ NO _
PharmaStem thus received special verdicts of both direct joint infringement and contributory infringement. My colleagues grant JMOL on the ground that since the defendants are providing a service, not selling a product, they can not meet the “sale” requirement of contributory infringement, 35 U.S.C. § 271(c).[1] Phar-maStem points out that a reasonable jury could have found that the defendants sell (rent) their blood-storage facilities to the donor’s family, and that the defendants either contribute to or act in concert with the transplanting surgeon to practice the claimed method.
The principles of patent infringement are not negated when the steps of a method claim are performed by more than one entity. There was no instruction as to legal impossibility of liability as to the '553 patent, and no objection was raised to the verdict questions. We are not told whether the legal theory of sale or rent was aired at the trial, but it is apparent that the jury was fully apprised of the nature of the accused activities, as reflected in the jury questions. The processes of litigation require appellate review on the premises of the jury trial, lest invited error dominate trial tactics.
No objection was raised to the jury instructions. The distinction relied on by *1383 the panel majority, that the defendants were bailees, not sellers, does not negate the principles of infringement, whether viewed as joint infringement or contributory infringement. See, e.g., On Demand Machine Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1334 (Fed.Cir.2006) (approving instruction that “It is not necessary for the acts that constitute infringement to be performed by one person or entity”) Phar-maStem is correct that the issue to which this evidence applies relates to damages, not infringement, and points to the small amount of damages awarded for infringement of the '553 patent (damages for the '553 patent were not appealed by the defendants).
It is irrelevant whether any steps of a method claim can be viewed as a “service;” infringement requires only that the steps be performed. As discussed in Dawson Chemical Co. v. Rohm and Haas Co., 448 U.S. 176, 188, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980), the purpose of the contributory infringement statute is “to protect patent rights from subversion by those who, without directly infringing the patent themselves, engage in acts designed to facilitate infringement by others,” a criterion that the jury could have found was met by the facts and relationships of this case. On the instructions to the jury, the verdict of liability for contributory or joint infringement of the '553 patent is supported by substantial evidence, and should be sustained.
From the court’s departure from the procedures of appellate review of jury verdicts, and from the flawed law that is propounded, I must, respectfully, dissent.

. § 271(c). Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial nonin-fringing use, shall be liable as a contributory infringer.